ON MOTION FOR REHEARING
TAYLOR, J.
We grant appellee’s motion for rehearing, withdraw our previous opinion, and substitute the following in its place.[1] No further motions for rehearing or clarification will be entertained.
This appeal stems from a suit against the law firm of Becker & Poliakoff for legal malpractice and breach of fiduciary duty. Jacquelyn Young appeals from the trial court’s order remitting the jury’s $4.5 million punitive damages award against Becker & Poliakoff to $2 million, or alternatively, granting a new trial on punitive damages. Becker & Poliakoff cross-appeals, contending that it was entitled to a directed verdict on legal malpractice and a new trial due to the trial court’s limitation on cross-examination of a crucial witness. We affirm as to all issues raised in both the appeal and the cross-appeal.
The underlying litigation arose from Young’s dissatisfaction with Becker & Po-liakoff s handling of her federal employment discrimination suit against BellSouth Telecommunications (BellSouth). The suit was filed on May 1, 2001 by Thomas Romeo, an associate with Becker & Poliakoff, on behalf of Young and twelve other Bell-South employees. At that time, Becker & Poliakoff was engaged in settlement negotiations on behalf of Young and several other plaintiffs in a separate action against BellSouth, styled Jackson v. BellSouth Telecommunications, 372 F.3d 1250 (11th Cir.2004). The Jackson case was brought against the law firm of Ruden, McClosky, Smith, Schuster & Russell, P.A. (Ruden McClosky) for alleged misconduct arising out of their settlement of a prior employment discrimination lawsuit against Bell-South, styled Adams v. BellSouth Telecommunications.
In the original Adams litigation, Ruden McClosky represented the plaintiffs and negotiated a settlement for them. In the later-filed Jackson case, the plaintiffs alleged that Ruden McClosky, while negotiating the settlement in Adams, made an improper side deal with BellSouth and entered into undisclosed agreements that were unlawful and unethical.[2] Young was among the several plaintiffs in the Jackson case who hired Becker <& Poliakoff to represent them against BellSouth and Ruden McClosky.
Ultimately, Becker & Poliakoff settled the Jackson case in the summer of 2002 for $8 million. The firm received *1006 $2,927,540.00 for its fees and costs. Before the case was settled, however, and while settlement negotiations were underway, Attorney Thomas Romeo and Becker & Poliakoff were hired by Young and twelve other plaintiffs to file a separate federal lawsuit on their behalf against BellSouth for alleged continuing discrimination. Unbeknownst to Young, this new lawsuit was dismissed due to the statute of limitations. The conflict of interest posed by Becker & Poliakoffs representation of plaintiffs in this new lawsuit, while settling the Jackson case, underlay Young’s claims of legal malpractice and breach of fiduciary duty in the instant ease.
In her lawsuit against Becker & Polia-koff, Young alleged that the law firm intentionally delayed telling her about the dismissal of her case until after the Jackson case was settled. The jury determined that Becker & Poliakoff knew that the case had been dismissed, but withheld that information from Young so they could settle Jackson and secure the $2.9 million fee and cost reimbursement in that case. The jury returned a verdict for Young of $394,000 in compensatory damages as a result of Becker & Poliakoffs breach of fiduciary duty. The total compensatory damages consisted of $144,000 in past lost wages and $250,000 in damages for “pain and suffering, mental anguish, or loss of dignity.”
The jury also awarded $4.5 million in punitive damages against Becker & Polia-koff. However, the trial court remitted the punitive damages to $2 million, finding that the amount was not supported by evidence that Becker & Poliakoff had sufficient financial resources to support such a verdict without facing bankruptcy. Young rejected the remittitur/new trial order and filed this appeal.
“Under Florida law, a trial court’s determination of whether a damage award is excessive, requiring a remittitur or a new trial, is reviewed by an appellate court under an abuse of discretion standard.” Engle v. Liggett Group, Inc., 945 So.2d 1246, 1263 (Fla.2006); see also City of Hollywood v. Hogan, 986 So.2d 634, 647 (Fla. 4th DCA 2008); Weinstein Design Group, Inc. v. Fielder, 884 So.2d 990, 1002 (Fla. 4th DCA 2004). In ruling on a motion for remittitur, the trial court must evaluate the verdict in light of the evidence presented at trial. Hogan, 986 So.2d at 648. Section 768.74, Florida Statutes, provides criteria for evaluating awards of damages and mandates that courts subject awards of damages to close scrutiny and make certain that they be adequate and not excessive. Id.
In evaluating a punitive damages award, the trial court must also determine whether the award comports with constitutional due process requirements. “The three criteria a punitive damages award must satisfy under Florida law to pass constitutional muster are: (1) ‘the manifest weight of the evidence does not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct;’ (2) the award ‘bears some relationship to the defendant’s ability to pay and does not result in economic castigation or bankruptcy to the defendant;’ and (3) a reasonable relationship exists between the compensatory and punitive amounts awarded.” R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060, 1072 (Fla. 1st DCA 2010) (citing Engle, 945 So.2d at 1263-64).
In this case, the trial court found that the $4.5 million punitive damages award overcame the presumption of exces-siveness under section 768.73, Florida Statutes. The court, however, concluded that the award did not satisfy the criteria for constitutionality. Although the court *1007 found that the first and third criteria mentioned above were met because the award was proportional to reprehensible conduct of the defendant and bore a reasonable relationship between the compensatory and punitive amount awarded, it found that the award fell short on the second criteria; it was excessive because it was “too much for Defendant to bear without economic castigation or bankruptcy.” As explained in the trial court’s thorough and detailed order, this finding is supported by the record.
After noting that the jury apparently discredited evidence presented by the defense regarding Becker & Poliakoffs financial picture, the trial court turned to testimony of Young’s financial expert, Dr. Pettingil, in determining that the $4.5 million punitive damages award would bankrupt Becker & Poliakoff. In short, the trial court found that Dr. Pettingil’s opinion placed the law firm’s net worth at $9.7 million to $11.1 million, and that “a $4.5 million punitive damages award constitutes forty percent of the net worth of the company.” This amount, the court reasoned, was “too large” and exceeded “the highest amount that can be sustained based upon the evidence.” Explaining how it arrived at the $2 million remittitur amount, the court stated the following:
The court finds that the maximum award that will not be excessive is $2 million which constitutes about 18%-20% of the firm’s net worth. Dr. Pettingil’s testimony establishes sufficient assets to bear this amount. His testimony established annual earnings of $675,000.00 per year increasing by 3% in 2010 and every year thereafter, $3 million per year in extraordinary compensation and a total of $1.5 million in retained earnings. Over 2009 and 2010 this would amount to assets exposable to collection of a punitive damage award of $6 million to $9 million, depending upon the extent of payment to officers’ extraordinary compensation.
[[Image here]]
$2 million is as close to disgorging what the jury determined to be ill-gotten gains as Defendant’s financial wealth will tolerate.
Contrary to Young’s contention, the trial court did not improperly substitute its judgment for that of the jury, but instead properly exercised its discretion in reviewing the award upon the financial information in evidence. See Arab Termite & Pest Control of Fla. v. Jenkins, 409 So.2d 1039, 1043 (Fla.1982) (“Since the defendant’s financial position is proper for the jury to consider in imposing punitive damages, it must be considered along with the malice of the defendant’s conduct in ruling on the question whether the jury’s assessment is excessive in light of the manifest weight of the evidence.”) (citation omitted). While a punitive damages award should be painful enough to provide some retribution and deterrence, it should not financially destroy a defendant. See Lipsig v. Ramlawi, 760 So.2d 170, 188 (Fla. 3d DCA 2000) (remanding for trial court to remit the punitive damage award to reflect a reasonable relationship to the defendant’s net worth). We, therefore, do not disturb the amount of the punitive damages ordered by remittitur; reasonable people could differ over this matter, and, therefore, no clear abuse of discretion is shown. See S & S Toyota, Inc., v. Kirby, 649 So.2d 916, 921 (Fla. 5th DCA 1995) (applying abuse of discretion standard in upholding remittitur of punitive damages award).
We further find any error in the trial court’s ruling that prohibited Dr. Pet-tingil from testifying that an award of $10 million would not bankrupt Becker & Po-liakoff to be harmless. Here, the witness *1008 was allowed to state his opinion concerning valuation of the firm’s net worth and its financial ability to pay an award. And, even without hearing the witness’s opinion as to whether an award of $10 million would bankrupt the firm, the jury still awarded $4.5 million in punitive damages-an amount the trial court found to be excessive in relation to the firm’s net worth.
We reject Becker & Poliakoffs argument that the punitive damages award should have been set aside or remitted further. In connection with this argument, Becker & Poliakoff argues that the only “loss” cognizable in this case would have been loss of wages and that mental anguish damages were precluded by the impact rule.[3] Assuming, without deciding, that the damages for mental anguish were not properly awardable as compensatory damages in this case, it is clear that the jury awarded at least some compensatory damages for breach of fiduciary duty. Thus, we need not consider whether punitive damages could have been awarded in this case in the absence of actual damages.
Turning to the issue of whether the $2 million punitive damage award was excessive, our review is de novo. See Engle v. Liggett Group, Inc., 945 So.2d 1246, 1263 (Fla.2006). We will assume, without deciding, that the compensable damages on which the punitive damages award could have been based were the $144,000 in lost wages.
The imposition of a punitive damage award is subject to constitutional limitations because “[t]he Due Process Clause of the Fourteenth Amendment prohibits a state from imposing a ‘grossly excessive’ punishment on a tortfeasor.” BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). “[T]he relevant constitutional line is ‘inherently imprecise.’ ” Cooper Indus., Inc. v. Leatherman Tool Group, 532 U.S. 424, 433-34, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). The United States Supreme Court has, however, identified three guideposts for assessing the reasonableness of punitive damages: (1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); Gore, 517 U.S. at 575, 116 S.Ct. 1589.
“[T]he most important indici-um of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.” Gore, 517 U.S. at 575, 116 S.Ct. 1589. Courts must determine the reprehensibility of a defendant by considering whether: “the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.” State Farm, 538 U.S. at 419, 123 S.Ct. 1513. Although “few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process,” the Supreme Court has declined to impose a bright-line ratio *1009 which a punitive damages award could not exceed. Id. at 425, 123 S.Ct. 1513. The Court further observed that “an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.” Id.
This court in Lawnwood Medical Center, Inc. v. Sadow, 43 So.3d 710 (Fla. 4th DCA 2010), held that punitive damages of $5 million — which represented only 5% of the defendant’s net worth — were neither arbitrary nor excessive in an action for slander per se, despite the fact that the jury awarded no compensation beyond presumed nominal damages, where the jury found that the defendant’s defamation was intentional and malicious. Relying on TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), which upheld a $10 million punitive damage award on a $19,000 compensatory damage award against a company worth over $2 billion, this court reasoned that “extraordinary wrongdoing justifies extraordinary civil punishment without limiting ratios.” Lawnwood, 43 So.3d at 732.
In this ease, we cannot conclude that the $2 million punitive damages award was excessive. The amount of punitive damages assessed was in reasonable proportion to the malice, outrage, or wantonness of the tortious conduct. There is one highly relevant circumstance that could be taken into account in determining that the punitive damage award was not excessive — namely, the $2.9 million profit that Becker & Poliakoff made when it abandoned Young as a client to ensure that it could settle the Jackson case. Moreover, the trial court correctly concluded that Becker & Poliakoff had the ability to pay a $2 million punitive damages award. Finally, we decline to apply a rigid mathematical ratio in analyzing the propriety of the $2 million punitive damages award. To be sure, the ratio between the punitive damages and the actual damages was well over 4:1. But extraordinary wrongdoing occurs when a law firm intentionally abandons a client and thwarts her ability to recover for a violation of her civil rights so that the firm can reap financial gain in another case. The punitive damages in this case were properly assessed to further the State’s legitimate interests in punishing reprehensible conduct and deterring its repetition. See Gore, 517 U.S. at 568, 116 S.Ct. 1589 (“Punitive damages may properly be imposed to further a State’s legitimate interests in punishing unlawful conduct and deterring its repetition.”).
On cross-appeal, Becker & Poliakoff raises two issues: (1) that the trial court erred in denying its motion for directed verdict, and (2) that the trial court reversibly erred in limiting cross-examination of a crucial witness for the plaintiff.

I. Denial of Directed Verdict

Becker & Poliakoff contends that it was entitled to a directed verdict on Young’s legal malpractice complaint because the evidence failed to establish that any loss suffered by Young was attributable to legal malpractice or a breach of fiduciary duty. Rather, the firm argues, Young voluntarily abandoned or waived her employment discrimination claims.

A. Background

On May 1, 2001, Thomas Romeo (Romeo), an associate with Becker & Polia-koff, filed a complaint in federal court on behalf of Young and twelve other Bell-South employees. The complaint alleged race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (“Title VII”), the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Florida Civil Rights Act (“FCRA”), Florida Statute § 760.10, et seq. The *1010 complaint also alleged negligent retention and supervision under Florida law.
Before the complaint was filed, Young had filed her charge of discrimination against BellSouth with the Equal Employment Opportunity Commission (EEOC) on June 28, 2000. EEOC sent Young a “Dismissal and Notice of Rights” letter (“right-to-sue letter”) on January 31, 2001, which advised her that “based upon its investigation, the EEOC [was] unable to conclude that the information obtained establishes violations of the statutes.” The letter notified Young that if she decided to file a private suit against BellSouth, she had ninety (90) days from receipt of the notice to file the suit. Otherwise, her right to sue based on the above charges would be lost. Young thus had ninety days, or until May 1, 2001, to file a civil suit based upon her June 28, 2000 charge of discrimination against BellSouth.
As evidence that all conditions precedent to filing suit were satisfied, Romeo referenced and attached the EEOC right-to-sue letter to the federal complaint; however, it was the wrong letter. Romeo attached Young’s 1998 EEOC right-to-sue letter regarding an earlier discrimination charge rather than the January 31, 2001 right-to-sue letter. In response to the May 2001 complaint, BellSouth filed a motion to dismiss. On September 26, 2001, the federal district court dismissed the Title VII and the FCRA claims with prejudice, finding them both time-barred. The court found the Title VII claim time-barred due to the plaintiffs’ failure to file suit within ninety days after receiving the right-to-sue letter from EEOC; it found that the FCRA claim was time-barred based on the applicable four-year statute of limitations. The court dismissed without prejudice the remaining claims.
Becker & Poliakoff not only failed to file a response to BellSouth’s motion to dismiss the May 2001 complaint, but also failed to move to set aside the dismissal and re-file the complaint with the correct January 31, 2001 right-to-sue letter; it also failed to appeal dismissal of the claims. The firm then waited until October 4, 2002, thirteen months after the dismissal of Young’s complaint, to notify Young that her case had been dismissed. By letter, the firm advised Young that it was withdrawing from representation on the case and that she should “seek the advice of an attorney expeditiously as one or more additional statutes of limitation may run if you fail to file your claim prior to the running of the statutes of limitation.”
Young encountered considerable difficulty finding another lawyer willing to represent her. She testified, “no one would touch it,” and that “[e]verybody that I went to and showed the information, showed them all the documents, they would not take it.” Although she eventually found a lawyer who was willing to take her case and who actually filed a suit on her behalf in 2003, the lawyer later advised her against pursuing the action in light of the dismissal of her Title VII claim and subsequent rulings by the federal district court that the new action was substantively identical to that case and subject to dismissal upon BellSouth’s affirmative defenses of res judicata, collateral estoppel, and laches.
Young subsequently voluntarily dismissed the 2003 lawsuit with prejudice on November 24, 2004, and brought a malpractice suit against Becker & Poliakoff for its handling of her 2001 employment discrimination suit against BellSouth.

B. Analysis

Becker & Poliakoff argues that the trial court abused its discretion by not granting its motion for directed verdict because the evidence did not establish that Becker & *1011 Poliakoff caused Young to lose the ability to proceed with her discrimination claims against BellSouth. The firm maintains that Young unilaterally, intentionally and voluntarily abandoned her discrimination suit against BellSouth, despite the viability of her claims, thereby precluding any action against Becker & Poliakoff for legal malpractice. Specifically, Becker & Polia-koff argues that Young’s FCRA, § 1981, and state negligence claims could have been pursued even after her Title VII and FCRA claims were dismissed.
“The standard of review on appeal of the trial court’s ruling on a motion for directed verdict is de novo.” Martin Cnty. v. Polivka Paving, Inc., 44 So.3d 126, 131 (Fla. 4th DCA 2010) (quoting Fina v. Hennarichs, 19 So.3d 1081, 1084 (Fla. 4th DCA 2009)). Further, “[w]hen an appellate court reviews the trial court’s denial of a motion for directed verdict, it must ‘view the evidence and all inferences in a light most favorable to the non-mov-ant, and should reverse if no proper view of the evidence could sustain a verdict in favor of the non-movant.’ ” Conrad v. Young, 10 So.3d 1154, 1157-58 (Fla. 4th DCA 2009) (quoting Weinstein Design Group, Inc. v. Fielder, 884 So.2d 990, 997 (Fla. 4th DCA 2004)).
Becker & Poliakoff relies on Chipman v. Chonin, 597 So.2d 363, 364 (Fla. 3d DCA 1992), for the general principle that “[a] party cannot recover damages for legal malpractice unless it is shown that the lawyer neglected a reasonable duty which was the proximate cause of the client’s loss.” The law firm argues that Young did not establish that she was prevented from proceeding on her employment discrimination claims by its actions and thus failed to establish damages proximately caused by its alleged negligence. We disagree.
“The circumstances in which a client’s subsequent actions constitute an abandonment of a legal malpractice claim, as a matter of law, are very narrow.” Lenahan v. Russell L. Forkey, P.A., 702 So.2d 610, 611 (Fla. 4th DCA 1997). In Lenahan, we held that a client’s dismissal of an underlying lawsuit in Virginia did not entitle an attorney to summary judgment in a malpractice suit in Florida where there were genuine issues of material fact as to whether the attorney’s representation of the client precluded the client from prevailing in the Virginia lawsuit.
Taking the evidence in the light most favorable to Young, we find that the circumstances of this case demonstrate that Young did not abandon her legal malpractice claim. The federal district court dismissed both the Title VII and FCRA claims with prejudice. Those claims were dual-filed with the EEOC and the Florida Commission on Human Relations (“FCHR”) and traveled together. See Woodham v. Blue Cross & Blue Shield of Fla., Inc., 829 So.2d 891, 893 (Fla.2002) (explaining that pursuant to the EEOC/ FCHR workshare agreement, each agency designates the other as its agent for purposes of receiving, investigating, and filing charges, and a claimant’s filing with the EEOC automatically operates as a dual-filing with the FCHR). The evidence showed that the district court’s dismissal of these claims was due to Becker & Polia-koffs mistake in failing to attach the January 31, 2001 right-to-sue letter to the complaint it filed on May 1, 2001. The firm did not seek leave to amend the complaint, appeal the dismissal, or take other corrective action. Thus, Young’s opportunity to bring a successful Title VII or FCRA claim was permanently and irreparably lost by the law firm’s actions and inaction. Further, the firm’s failure to take any prompt action following the dismissal without prejudice of Young’s § 1981 and state *1012 negligence claims subjected these claims to affirmative defenses, such as laches.
Young introduced sufficient evidence to demonstrate that her voluntary dismissal of the later-filed 2003 suit did not constitute an abandonment or waiver of her claims and did not cause her loss. Rather, her employment discrimination claims, all of which arose out of the same operative facts as those alleged in her 2001 complaint, were severely damaged, if not destroyed, by defenses available to, and actually raised by, BellSouth. These included affirmative defenses of res judicata, collateral estoppel, laches, and the rule against splitting causes of action. Indeed, Young testified that she could not find a lawyer to maintain her employment discrimination claims because their legal viability and economic value had been lost or substantially diminished by the federal district court’s dismissal of her claims in 2001. Under these facts and circumstances, and viewing the evidence and all inferences in a light most favorable to Young, we cannot find that Young abandoned or waived her claims or that Becker & Poliakoffs mishandling of her case could have been corrected by pursuit of the second suit. Accordingly, we conclude that the trial court properly denied the motion for directed verdict.

II. Impeachment Evidence of Thomas Romeo’s Disbarment

Becker & Poliakoff next argues on cross-appeal that the trial court erred in not allowing it to impeach Thomas Romeo during cross-examination with evidence of his disbarment from law practice. We disagree and affirm on this point. Evidence that Romeo was disbarred was properly excluded by the trial judge due to its lack of relevance and unfairly prejudicial effect.

A. Background

As discussed above, Thomas Romeo was the Becker & Poliakoff associate who filed Young’s 2001 lawsuit against Bell-South. He testified about the facts and circumstances surrounding his handling of the Young v. BellSouth case while employed with Becker & Poliakoff. After first answering some general background questions about his education and legal experience, Romeo told the jury about the actions he took on Young’s behalf, both before and immediately after he filed the lawsuit; he explained the procedures for filing a charge of discrimination with the EEOC, issues relating to class action suits, and methods for checking client conflicts when opening a case. Romeo also described the claims he filed in the May 2001 complaint and explained the statutory basis for filing the specific federal and state race discrimination claims. He said that after evaluating Young’s charge of discrimination, he thought her claims “were well substantiated and viable claims that would result in damages being awarded.” In addition, Romeo testified about his discussion with other attorneys at Becker & Poliakoff concerning Young’s case and his understanding back in 2001-2002 of certain documents and e-mails pertaining to potential conflicts with her case.
Before defense counsel for Becker & Poliakoff began his cross-examination of Romeo, he sought permission of the trial court to introduce evidence that Romeo was disbarred in 2003, as well as details of the basis for the disbarment. He argued that, because Romeo was a key witness at trial, his credibility was “squarely at issue.” Therefore, he should be allowed to impeach Romeo’s credibility with evidence of his disbarment.
In ruling that evidence of Romeo’s disbarment was not admissible, the trial court *1013 relied on Tormey v. Trout, 748 So.2d 303, 306 (Fla. 4th DCA 1999). Tormey is precisely on point. There, we held that cross-examination of the defendant’s medical expert regarding administrative discipline was an improper attack on his credibility. Although we found the error harmless in Tormey, we reiterated the well-established rule that evidence of particular acts of misconduct may not be introduced to impeach the credibility of a witness.
Becker & Poliakoff argues on appeal that Young’s counsel “opened the door” to the disbarment evidence when, while eliciting background information on direct examination, he asked Romeo whether he was currently practicing law. To this question, Romeo merely responded “No.” Becker & Poliakoff contends that Romeo’s statement that he was not currently practicing law was misleading, and that the disbarment evidence was necessary to clarify his status and explain why he was no longer practicing law. Becker & Polia-koff complains that Romeo testified extensively about office procedures, legal matters, and e-mails and conversations with attorneys pertinent to the breach of fiduciary duty claim — all “in the guise of being a lawyer.” The jury, it argues, was entitled to know that he was no longer a lawyer — not by choice — but because he had lost his license.

B. Analysis

The standard of review for a trial court’s ruling on objections to testimony is abuse of discretion. See Petit-Dos v. Sch. Bd. of Broward Cnty., 2 So.3d 1022, 1025 (Fla. 4th DCA 2009). This standard applies to a trial court’s decision to exclude evidence attacking the credibility of a witness. See Childers v. State, 936 So.2d 585, 592 (Fla. 1st DCA 2006). Only when it appears that evidentiary errors injuriously affected the substantial rights of the complaining party will a judgment be reversed. Forester v. Norman Roger Jewell & Brooks Int’l, Inc., 610 So.2d 1369, 1372 (Fla. 1st DCA 1992). Appellant has the duty to demonstrate not only error in evidentiary rulings, but prejudice from such rulings as well. Id. at 1373.
We fail to see how Romeo’s testimony that he was not currently practicing law opened the door to evidence of his disbarment. His testimony was not misleading to the jury; he never represented to the jury, expressly or impliedly, that he was a lawyer in good standing, and he did not testify about legal issues as an expert witness. Romeo testified merely as a fact witness concerning his recollection of events surrounding the Young v. BellSouth case. He referred to areas of discrimination law and procedures only to explain why he filed certain claims and took particular actions during the relevant time period. The fact that he was disbarred at a later date for unrelated reasons was irrelevant and unfairly prejudicial. The trial court ruled appropriately and did not abuse its discretion in disallowing this evidence.
In sum, on the main appeal, we affirm the trial court’s order for remittitur or new trial based on the “economic castigation or bankruptcy” ground relied on by the trial court. As to the cross-appeal, we find no error in the trial court’s denial of Becker & Poliakoff’s motion for directed verdict and its ruling on the proffered impeachment evidence. Accordingly, we affirm the final judgment.
WARNER and DAMOORGIAN, JJ., concur.

. We grant rehearing to address on the merits certain arguments presented in appellee's Answer Brief and Initial Brief on Cross-Appeal which were not designated as issues on cross-appeal.

. As summarized in Jackson, "First, the plaintiffs’ lawyers agreed not to sue BellSouth on any employment discrimination claim for a period of one year. Second, BellSouth and Ruden McClosky entered into a four-year 'consulting agreement’ by which $120,000 of the settlement fund was paid directly to Ru-den McClosky. The plaintiffs say that this agreement was negotiated to create a conflict of interest that would prevent Ruden McClo-sky from representing any future plaintiffs against BellSouth, effectively buying the loyalty of the plaintiffs' attorneys from the plaintiffs.” 372 F.3d at 1259-60 (footnotes omitted).

. However, Becker & Poliakoff does not actually request that the compensatory award for emotional distress damages be overturned— only that such damages could not form the basis for the punitive damages award in this case.