DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SEVEN RESTAURANTS, LLC,** d/b/a **BURGER KING,**
Appellant,

v.

**RICHARD L. TULECKI, JR.,**
Appellee.

No. 4D2023-1925

[July 31, 2024]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael A. Robinson, Judge; L.T. Case No. CACE21-001669.

Warren B. Kwavnick of The Law Office of Warren B. Kwavnick, PLLC, Pembroke Pines, for appellant.

Neil Rose, Miami, for appellee.

GROSS, J.

Seven Restaurants, LLC d/b/a Burger King ("the franchisee") timely appeals a final judgment awarding the plaintiff, Richard L. Tulecki, Jr., nearly $7.5 million in this premises liability case. We reverse and remand for further proceedings because the trial court abused its discretion in admitting a changed expert opinion that came to light after the jury was sworn.

### *The Accident*

On a Sunday morning in July 2019 at around 9:00 a.m., the 45-year-old plaintiff and his wife went to eat breakfast at a Burger King restaurant operated by the franchisee.

The manager described the restaurant as a "high-volume" store. Four employees were at work that day—the manager taking drive-through orders, another employee taking front counter orders, and two others working in the kitchen or the back.

The plaintiff ordered food and sat down to eat. A few minutes later, he informed the manager or an employee that the restroom had a foul smell. During this interaction, the plaintiff did not report that there was grease on the restroom floor.

Responding to the plaintiff's report, the manager checked the restroom. She testified that the floor was clean and dry, not wet or greasy. Although the manager believed the restroom was fine, she instructed an employee "to touch it up."

The manager testified that the employee took a blue mop and a blue bucket and "touched up the restroom." The manager conceded that no "wet floor" sign was placed in the restaurant's lobby.

The restaurant has two mop buckets, one coded red and one coded blue. The red bucket was for the kitchen and back area, while the blue bucket was "only used for the lobby and the restrooms." The mops themselves were also red and blue. The manager explained that the reason for the two-mop system was to avoid contamination. For example, if an employee used the red mop to clean a kitchen oil spill and later used the same mop in the lobby, then the lobby would be "filled with oil, soap, and water" and "people would be sliding around wondering why."

About 30 to 45 minutes after the employee cleaned the restroom, the plaintiff reported to the manager that he had slipped and fallen in the restroom. When questioned about how busy the restaurant was at the time of the incident, the manager responded that the plaintiff and his wife were the only persons in the lobby "at or around" the time of the incident.

The plaintiff described his slip-and-fall. After he finished eating and drank some tea, he "went to the bathroom, opened the door, took a few steps in, foop, bam, hit the floor hard." When he first walked into the bathroom, the plaintiff did not see grease on the floor because "the lighting was dark."

Following his fall, however, the plaintiff had "stuff" all over his hands. He got up, opened the door, and told his wife that he had just fallen. His wife brought him some napkins and he started wiping off his hands.

The plaintiff walked up to the front and told the manager, "I just slipped in your bathroom and fell." The manager replied, "[W]hat? I just had that cleaned." The manager grabbed a yellow "wet floor" cone and placed it in front of the restroom.

2

The manager then opened the door, looked inside, and said, "[A]in't nothing wrong with the bathroom." At trial, the manager testified that there was "no greasy substance or wet floor" in the restroom when she inspected it after the incident.

Realizing that he was "going to need some proof," the plaintiff went back into the restroom and used his cell phone to record a video of his feet slipping and sliding on the restroom floor. The plaintiff testified that even after he came back out of the restroom, it took him about five steps before his feet "started gripping a little bit more."

The jury viewed the restroom video at trial. The video showed no "wet floor" sign in the restroom. The jury heard the plaintiff make the following comment in the video before the sound was shut off: "This whole floor is covered in grease. I fell and busted – ."

The plaintiff's wife propped open the door while he videotaped the restroom. The plaintiff could see grease on the floor when his wife was holding open the door and the light from outside shined into the restroom. The plaintiff's wife likewise testified that when the plaintiff went back inside the restroom after his fall, "he kept on sliding around." The plaintiff's wife "stepped in a little," but the floor was "really slippery" and her foot slid. The substance was "like grease on the floor." It "looked like black ice because you couldn't see it, but it was there."

The manager explained that the restrooms in the restaurant "need to be checked or attended to every 15 minutes," which is a written policy of Burger King. The manager testified that the 15-minute inspections are documented on a tablet. According to the manager, before the plaintiff arrived that day, the restaurant used its checklist to ensure the restroom was cleaned every 15 minutes.

However, the franchisee's CEO testified that he found no documentation of any cleaning or restroom checks that might have occurred on the morning of the incident. The CEO also testified that he was unable to locate a written policy requiring employees to inspect or clean the restrooms every 15 minutes. According to the CEO, the official corporate policy is that cleaning occurs "whenever it's needed." The CEO acknowledged that this standard was "the minimal expectation," that managers have the freedom to "go above and beyond," and that cleaning the restroom every 15 minutes would "go above and beyond."

### The Orthopedic Injuries

The plaintiff and his wife left the restaurant and attempted to fish, but he was "a little sore" from back pain so they decided to go home. The plaintiff's wife took him to an emergency room at around 5:00 p.m. after his pain worsened. The plaintiff was discharged with instructions to follow up with a physician if his pain continued.

The plaintiff experienced constant back pain and ultimately sought treatment again about two weeks after the accident. The plaintiff underwent an MRI in August 2019 and initially pursued conservative care, which relieved his headaches and neck pain, but not his back pain. A radiologist testified that the August 2019 MRI showed disc herniations at two levels that were recent or acute.

The plaintiff was later referred to an orthopedic surgeon, as he was experiencing significant back pain radiating to his leg. The surgeon took a medical history from the plaintiff and did not note any prior low back issues.

The plaintiff's MRI results from August 2020 showed several herniated discs. Following an additional test called a provocative discogram, the surgeon concluded that a damaged disc needed replacement.

The surgeon offered the plaintiff a choice of a spinal fusion or an artificial disc replacement, which the plaintiff chose because it allows more mobility.

On September 19, 2020, the plaintiff underwent the disc replacement surgery. The orthopedic surgeon opined, within a reasonable degree of medical probability, that (1) the fall that the plaintiff sustained at the restaurant in July 2019 was the cause of the injuries that he suffered to his lumbar spine, and (2) the care that he provided to the plaintiff since the date of the fall was medically necessary as a result of the fall. The surgeon conceded that he had not reviewed any of the plaintiff's medical records pre-dating the fall or from the date of the fall itself, and that the diagnostic films showed age-related degenerative changes.

By contrast, the franchisee presented expert testimony that no permanent injury resulted from the fall and that the procedures which the plaintiff had undergone were unrelated to the fall. Evidence at trial showed that the plaintiff had prior accidents resulting in back pain or injuries.

### *The Colon Perforation*

In the weeks following the disc replacement procedure, the plaintiff took pain medication and experienced stomach pain, nausea, constipation, and bloating.  Prior to the surgery, he had no issues with constipation.

On November 2, 2020, the plaintiff followed the instructions he received from a doctor's office and used an enema to relieve his constipation.  He initially experienced relief, but later that evening he suffered from nausea, vomiting, sweating, and a fever.

The next day, the plaintiff's wife took him to an emergency room.  The emergency room consultation notes mentioned the plaintiff's self-administration of an enema the night before, and diagnosed a "[p]erforated sigmoid (most likely self inflicted traumatic perforation)."

The plaintiff's perforated colon was a critical injury.  Dr. Jeremy Eckstein performed emergency surgery on November 4, 2020, removing the plaintiff's sigmoid colon and attaching a colostomy bag.  The plaintiff remained in the hospital for 17 days.

The plaintiff used the colostomy bag for about four months, an experience he described as "terrible" and "the worst thing [he] ever had." He detailed his difficulties with the bag.

Dr. Eckstein performed surgery to remove the colostomy bag after four months, resulting in complications like stomach pain, aches, chills, bathroom urgency, inability to eat and ripped out stitches.  Because the plaintiff was not able to receive any orthopedic treatment while the abdominal issue was pending, he had to deal with back pain during that time.

### *Facts Regarding the <u>Binger</u> Issue*

A. <u>The Medical Records, the Uniform Trial Order, and the Expert Witness List</u>

About 21 months before the trial, which commenced on May 8, 2023, the plaintiff responded to the franchisee's request for production by providing his medical records concerning all hospitalizations that he claimed resulted from the subject accident.  These medical records included the emergency room consultation notes regarding the plaintiff's perforated colon.

The Uniform Trial Order required that all experts be disclosed no later than 90 days prior to calendar call. By agreed order, the deadline to complete discovery was March 31, 2023.

On his expert witness list timely submitted in compliance with the Uniform Trial Order, the plaintiff listed Dr. Eckstein as a witness who would "provide his expert testimony as to his care and treatment of the plaintiff as a result of injuries sustained on July 28, 2019," and would "opine same within a reasonable degree of medical probability . . . ."

B. Dr. Eckstein's Discovery Deposition

On March 17, 2023, the franchisee took its discovery deposition of Dr. Eckstein. At the beginning of the deposition, Dr. Eckstein stated he had no independent recollection of the plaintiff. He initially testified that the plaintiff had a perforation of the colon due to diverticulitis. However, based on his review of the plaintiff's medical records during the deposition, Dr. Eckstein later corrected himself and noted that no diverticulum was seen in the pathology, adding that he now remembered this case.

Dr. Eckstein opined that, given the lack of evidence of diverticulosis, it was an "assumption" or a "possibility" that the perforation of the plaintiff's colon was due to forceful enema use—however, this "possible reason" for the plaintiff's pathology was "difficult to prove," the cause of the perforation was "to be determined," and he could not say within a reasonable degree of medical probability what the cause of the perforation was:

> A. . . . [W]hen he came in presenting with the symptoms that he did most likely the etiology was diverticulitis. So that was our assumption going in. We were sure that he had a perforation in the sigmoid most likely due to diverticulitis.
>
> But then after the operation we sent this to pathology and *he did not have diverticulums*. He did mention previously that because of the constipation he was using enemas to relieve that.
>
> So, you know, it's an *assumption* or a *possibility in the lack of evidence of diverticulosis would be a perforation of the colon due to forceful enemas*. That is a *possible reason* for his pathology.

6

Now, whether that's the case or not ***it's difficult to prove***. But what is obvious was that he did have a perforation of the colon. The etiology is, you know, ***to be determined***.

Q. Are you able to say ***within a reasonable degree of medical probability what the cause of his perforation was***?

A. No.

(Emphasis added).

Dr. Eckstein testified that he did not believe the colon perforation could have occurred during the plaintiff's spine surgery six weeks earlier, as a person cannot have a perforation for six weeks without it becoming septic. Instead, Dr. Eckstein testified within a reasonable degree of probability that the perforation would have happened within hours or days of the plaintiff's hospital visit on November 3, 2020.

On the plaintiff's cross-examination at the deposition, Dr. Eckstein said that the perforation "could have" been an injury from the enemas themselves, but whether that was the case was "difficult to assess with a hundred percent level of certainty":

Q. . . . Do you have any understanding as to how [the plaintiff's] colon became perforated?

A. Well, like I said before, the initial – the initial diagnosis was perforated diverticulitis given the location and the -- and how common this type of disease is. But once the pathology report came back showing no diverticulum and going back into his recent attempts to go to the bathroom using enemas ***this could have been an injury from the enemas themselves***.

***Whether that is the case*** or not whether he had a single diverticulum that wasn't seen or some other pathology that happened within hours or a few days before coming to the hospital ***that's difficult to assess with a hundred percent level of certainty***.

(Emphasis added).

Dr. Eckstein explained that constipation is a common side effect of pain medication and that if the plaintiff was still taking narcotics as a result of

his spine surgery, then that could have been the cause of his constipation. Dr. Eckstein testified that constipation itself could lead to a perforated colon, but it is not a common cause. Usually when this occurs, the patient has a large burden of hard stool at the end of the colon, but the plaintiff did not have that, either because the enemas were effective or because it never happened.

## C. Pretrial Motion in Limine

About a month before trial, the franchisee moved in limine to exclude any mention of—or requests for damages for—the plaintiff's bowel perforation and resulting treatment, arguing that no reliable evidence linked the perforation to the slip-and-fall or the spinal surgery.

In opposition to the motion, the plaintiff argued the existing evidence was sufficient to submit the bowel perforation claim to the jury.

The trial court (1) denied the motion in limine without prejudice insofar as the franchisee had sought to exclude any mention of the plaintiff's bowel perforation and resulting treatment as arising from the subject accident, and (2) deferred ruling on the franchisee's motion to exclude any requests for damages due to the bowel perforation.

## D. Trial Testimony and the Midtrial Deposition of Dr. Eckstein

In the evening after the first day of trial, the plaintiff took Dr. Eckstein's deposition to be presented as his trial testimony the following day.

In his trial testimony, Dr. Eckstein opined, within a reasonable degree of medical probability: (1) the plaintiff's perforated colon "was most likely caused by the administration of enemas"; (2) the plaintiff was constipated because he had spine surgery and later used narcotic medication, for which one of the side effects is constipation; and (3) the plaintiff "perforated his colon through the forceful use of an enema to relieve constipation he suffered as a result of spine surgery."

On the franchisee's cross-examination, Dr. Eckstein testified that he had not reviewed any additional records, but had spoken with the plaintiff's attorneys a week previously and again the morning of the deposition. They had discussed the prior deposition, the purpose of the current deposition, and Dr. Eckstein's thoughts about what happened when he saw the Plaintiff as a patient.

Dr. Eckstein confirmed that the only action he had taken since the prior deposition was talking to the plaintiff's attorneys and recalling events, as he did not review the transcript of his prior deposition.

Dr. Eckstein noted that he initially thought the plaintiff had diverticulitis but remembered during questioning why the patient had the perforation. The franchisee's counsel pointed out that Dr. Eckstein had previously testified he could not determine the cause of the perforation with reasonable medical probability, to which Dr. Eckstein responded, "Yes," and acknowledged that today he had a "different answer."

Dr. Eckstein attributed his "different answer" to reviewing the case and the pathology, stating: "I think I may have changed my mind during this deposition." He denied that conversations with the plaintiff's attorneys influenced his opinion.

Dr. Eckstein clarified that during the first deposition, he was looking at the records for the first time and realized his initial mistake as he "went through" the records, especially after reading the consultation note and pathology report which did not show any diverticulitis.

When asked what he had reviewed to change his mind for his trial testimony, Dr. Eckstein answered: "I don't think I changed my mind. I think that my mind was changed during the last deposition when I realized that I was making a mistake in my recollection of the patient." Dr. Eckstein explained that he initially thought the plaintiff had come for a harmless procedure or a colectomy because of diverticulitis. But "then during our [discovery] deposition, I had a chance to review the record in more detail . . . and I realized that I had made a mistake in recalling the patient's case initially. So I changed my mind during that deposition. The course of time may have reaffirmed my understanding . . . ." When the franchisee's counsel questioned why he did not state he had changed his mind during the deposition, Dr. Eckstein responded, "I believe I changed my mind once I reviewed the pathology."

When the franchisee's counsel then confronted Dr. Eckstein with his prior deposition testimony in which he had stated that the cause of the perforation was "to be determined," Dr. Eckstein suggested that the problem lied in semantics and his understanding of the "subjective" term "reasonable degree of medical probability."

E. Motion to Exclude Dr. Eckstein's New Testimony

The next morning, the franchisee moved to preclude Dr. Eckstein from being "allowed to testify in court today as he did last night." The franchisee argued that Dr. Eckstein's testimony from the night before—which the defense characterized as having given a "definitive cause" of the perforation as "forceful use of an enema due to constipation from taking narcotic medication and/or from spine surgery six weeks prior"—contradicted his prior deposition testimony when he was unable to say the cause of the perforation within a reasonable degree of medical probability. The franchisee argued that it had been prejudiced because it was relying upon Dr. Eckstein's prior testimony that "he could not say what the cause of the perforation was" and that, if he had said this new causation opinion at the time of his original deposition, the defense could have hired an expert to combat that part of the case.

During the ensuing voir dire of Dr. Eckstein over FaceTime, Dr. Eckstein acknowledged that he "wasn't as certain as [he] was yesterday" when he testified in his original deposition. However, he characterized his opinion as having "evolved" rather than "changed," stating: "I wouldn't call it as changed. I think that it just evolved." While admitting that he initially had stated in his original deposition that he could not give an opinion within a reasonable degree of medical probability, he claimed that he had clarified the issue a few moments later in the same deposition when he explained that the colon rupture could have been caused by the constipation and the plaintiff's enema.

The franchisee's counsel reiterated that at the original deposition, Dr. Eckstein "never makes the statement within a reasonable degree of medical probability the cause of the perforation was from a forcible enema."

The plaintiff's counsel replied—arguably inaccurately—that "even in the course of the deposition from March [Dr. Eckstein] *arrived at the conclusion*, yes, not with 100 percent certainty, which is not the standard, *it is probability*, *that the colon perforation was caused by an enema*."[1] (emphasis added). The plaintiff's counsel further argued that Dr. Eckstein's opinion regarding the cause of the perforated colon was consistent with the emergency room medical records. The plaintiff's counsel thus argued that "there was no surprise."

---

[1] The plaintiff's counsel had previously mischaracterized Dr. Eckstein's original deposition as including an opinion that he could determine the cause of the perforation to a reasonable degree of medical probability: "And so with certainty, with absolute certainty he said he could not. Within a reasonable degree of medical probability, he said he could."

The franchisee's counsel renewed the motion to strike Dr. Eckstein's new testimony due to its "last minute" nature and the prejudice to the franchisee. The trial court denied the motion without elaboration.

Based upon the court's ruling as to the admissibility of Dr. Eckstein's new testimony, the franchisee stipulated to the medical records concerning the colon surgery coming into evidence while otherwise preserving the objection.

### *Verdict*

The jury returned a verdict finding negligence on the part of the franchisee that was a legal cause of the plaintiff's damages. The jury found no negligence on the part of the plaintiff. The jury awarded the following damages:

| | |
|---|---|
| Past medical expenses | $693,345.00 |
| Future medical expenses | $2,500.00 |
| Past pain & suffering | $995,760.00 |
| Future pain & suffering | $2,768,160.00 |
| Past wage loss | $350,000.00 |
| Loss of future earning capacity | $3,000,000.00 |
| Total | $7,809,765.00 |

### *Final Judgment*

The trial court denied the franchisee's post-trial motions. In accordance with the verdict and after applying setoffs, the court entered judgment in favor of the plaintiff. This appeal ensued.

### *The Trial Court Properly Denied the Franchisee's Motion for a Directed Verdict Because the Evidence was Sufficient to Prove that the Franchisee's Employee Had Actual Knowledge of the Greasy Condition that Had Caused the Slip-and-Fall*

The franchisee first argues that the trial court erred in denying its motions for a directed verdict because the plaintiff failed to meet his burden of proving that the franchisee had actual or constructive knowledge of the alleged greasy condition on which he slipped.

We review a trial court's ruling on a motion for directed verdict de novo, viewing the evidence and all inferences in a light most favorable to the non-movant. *Young v. Becker & Poliakoff, P.A.*, 88 So. 3d 1002, 1011 (Fla. 4th

DCA 2012). We "must affirm the denial of a motion for directed verdict if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party." *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009).

Section 768.0755, Florida Statutes (2019), governs liability for slip-and-falls caused by transitory foreign substances in a business establishment, and requires proof of actual or constructive knowledge of the dangerous condition:

> (1) If a person slips and falls on a transitory foreign substance in a business establishment, the injured person must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Constructive knowledge may be proven by circumstantial evidence showing that:
>
> (a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or
>
> (b) The condition occurred with regularity and was therefore foreseeable.

Enacted in 2010 to replace section 768.0710, section 768.0755 differs from its predecessor in two ways: (1) by requiring proof of actual or constructive knowledge of the dangerous condition as an element of the claim; and (2) by removing language regarding the owner's negligent maintenance, inspection, repair, warning, or mode of operation. *Pembroke Lakes Mall Ltd. v. McGruder*, 137 So. 3d 418, 424–26 (Fla. 4th DCA 2014). Absent actual or constructive knowledge of the dangerous condition, section 768.0755 does not allow for liability "based solely on the business establishment's general failure to maintain the premises." *N. Lauderdale Supermarket, Inc. v. Puentes*, 332 So. 3d 526, 530 (Fla. 4th DCA 2021).

"[W]hen a dangerous condition of a floor of a market is created by an agent or servant of the owner, then such owner may be held liable for resulting injuries to a business invitee." *Food Fair Stores, Inc. v. Trusell*, 131 So. 2d 730, 732 (Fla. 1961). "[T]he matter of the employer's knowledge of the existence of the dangerous condition becomes inconsequential . . . because the knowledge of the employee is chargeable against the employer and his negligent act committed in the course of his employment is binding upon the employer." *Id.*

12

Here, a view of the evidence in the light most favorable to the plaintiff reflects that the franchisee's employee was the last person in the restroom before the plaintiff fell. Therefore, the employee had actual knowledge of the condition of the restroom before and after he mopped it. Because the employee's knowledge is chargeable against the franchisee as contemplated by *Food Fair Stores*, the jury could reasonably find that the franchisee had actual knowledge under section 768.0755(1) of the greasy and slippery floor.

Accordingly, the trial court properly denied the franchisee's motion for directed verdict because the evidence, viewed in the light most favorable to the plaintiff, was sufficient to prove that the franchisee's employee had actual knowledge of the dangerous condition on the restroom floor that caused the plaintiff's fall. The direct evidence showed that:

• The plaintiff complained about a foul odor in the restroom shortly after arriving at the restaurant and did not mention anything about grease on the restroom floor.

• The manager checked the restroom in response to the plaintiff's complaint about the foul odor and found that the restroom floor was "*clean and dry.*"

• An employee then used a mop and bucket to clean the restroom floor.

• No "wet floor" sign was placed in the lobby at this time.

• The manager did not remember anyone in the lobby *that Sunday morning except for the plaintiff*, adding that the plaintiff and his wife "were the only folks in the lobby *at or around the time that this incident happened.*"

• About 30-45 minutes after the employee mopped the restroom, the plaintiff slipped and fell on grease on the restroom floor.

• After the accident, the plaintiff recorded a video of his feet sliding around on the restroom floor.

• The manager testified a written policy stated that restrooms "need to be checked or attended to every 15 minutes," but the franchisee's CEO found no documentation that detailed

whatever cleaning or bathroom checks might have occurred on the morning of the incident.

Because the evidence was that the restroom floor was "clean and dry" immediately before the franchisee's employee mopped the floor, the only *reasonable* inference from this evidence is that the employee created the greasy condition when he mopped the floor about 30-45 minutes before the accident. The jury was free to reject the manager's testimony that the employee used the blue mop designated for areas outside the kitchen. The manager testified that if the red kitchen mop were used in the lobby, the floor would be covered "with oil, soap, and water" and "people would be sliding around wondering why." Notably, this is exactly how the plaintiff appeared in the video of his feet sliding around on the restroom floor. The franchisee's suggestion that the greasy condition could have arisen "from a backed-up drain or a leak of some kind" is not a reasonable inference from the evidence, especially where the plaintiff's video showed no puddles of water on the floor and the manager testified that no wet floor existed when she inspected the bathroom after the plaintiff's fall.

This case is similar to the situation presented in *Steak 'n Shake Operations, Inc. v. Davis*, 265 So. 3d 694, 695 (Fla. 1st DCA 2019). There, the First District found no error in the denial of the defendant's motions for summary judgment and directed verdict where the evidence showed that the plaintiff walked over a recently mopped area in a Steak 'n Shake and fell, and the evidence was conflicting over whether the hostess had used a wet or dry mop and whether the hostess had placed a warning sign in the right spot. *Id.*

### *The Trial Court Abused its Discretion by Allowing the Plaintiff to Present New, Mid-Trial Expert Opinions as to the Cause of the Plaintiff's Colon Perforation*

The franchisee next argues that the trial court abused its discretion in allowing the plaintiff to present Dr. Eckstein's new, mid-trial expert opinion that, within a reasonable degree of medical probability, the plaintiff had perforated his colon through the forceful use of an enema to relieve constipation he had suffered as a result of post-surgery pain medication.

The problem of a previously disclosed expert witness who changes an opinion mid-trial is analyzed under the cases following *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1981).

*Binger* involved a witness whose name had not been disclosed in accordance with a pre-trial order. The Florida Supreme Court wrote that while a trial court "can properly exclude" such testimony, the court's discretion "should be guided largely by a determination as to whether use of the undisclosed witness will prejudice the objecting party." *Id.* at 1313–14. Prejudice in this sense means "surprise in fact," and is not dependent on the adverse nature of the testimony. *Id.* at 1314. Other relevant factors include: "(i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases)." *Id.*

Under *Binger*, "the test for exclusion of evidence for non-disclosure during pretrial discovery is whether the opposing party was prejudiced in his preparations for trial." *Gouveia v. Phillips*, 823 So. 2d 215, 222 (Fla. 4th DCA 2002). Still, "excluding the testimony of a witness is one of the most drastic of remedies which should be invoked only under the most compelling of circumstances." *Dep't of Health & Rehab. Servs. v. J.B. By & Through Spivak*, 675 So. 2d 241, 244 (Fla. 4th DCA 1996).

"The *Binger* rule has been extended from undisclosed witnesses to disclosed witnesses who offer previously undisclosed testimony." *Gurin Gold, LLC v. Dixon*, 277 So. 3d 600, 603 (Fla. 4th DCA 2019). "As this court has previously determined, the presentation of a changed opinion is tantamount to permitting an undisclosed adverse witness to testify." *Id.* (internal quotation marks omitted).

"*Binger* and its progeny provide that testimony, such as previously undisclosed expert testimony in the form of a new witness, undisclosed opinion, or substantially changed opinion, may be excluded when it is first offered after a critical point in time, if allowing it would result in surprise and substantial prejudice." *Cooper v. Gonzalez*, 374 So. 3d 841, 843–44 (Fla. 5th DCA 2023) (footnotes omitted). "Examples of critical points include pre-trial witness disclosure deadlines, discovery cutoffs, or, as here, after trial has commenced." *Id.* at 844.

"Civil trials are not the Wild West, where one side ambushes the other at trial." *Krysiak v. Dawson*, 301 So. 3d 259, 264 (Fla. 4th DCA 2020). Except under extraordinary circumstances, "the lawyers have a right to expect that once a trial commences, discovery and examinations must cease." *Grau v. Branham*, 626 So. 2d 1059, 1061 (Fla. 4th DCA 1993). "All the discovery rules and the extensive efforts of parties to discover the other party's case would be for naught if one side were able to wait until

after the trial started to establish key pieces of evidence . . . ." *Id.* "It is not enough that the defendant simply know what a witness may say before he testifies. Prejudice also exists by the fact that appellant is unable to counter the offered testimony." *Id.*

The discovery rules require "the disclosure of a substantial reversal of opinion . . . if a party intends to offer that changed opinion at trial." *Office Depot, Inc. v. Miller*, 584 So. 2d 587, 590–91 (Fla. 4th DCA 1991). After considering the relevant factors, "the witness should be permitted to testify only if his testimony will not endanger the fairness of the proceeding." *Id.* at 590.

Here, the trial court abused its discretion by allowing the plaintiff to present a new mid-trial expert opinion on the cause of his colon perforation, long after the discovery cut-off had passed. Dr. Eckstein's mid-trial opinion that, within a reasonable degree of medical probability, the colon perforation was caused by the forceful use of an enema to relieve constipation due to spine surgery and/or post-surgery pain medication was a substantial change from his earlier testimony in his discovery deposition.

Previously, Dr. Eckstein could only say that it was an "assumption" or a "possibility" that the perforation of the plaintiff's colon was due to forceful enema use, adding that this "possible reason" for the plaintiff's pathology was "difficult to prove," the cause of the perforation was "to be determined," and he could not identify within a reasonable degree of medical probability the cause of the perforation.

Dr. Eckstein's after-the-fact claim at trial—that he had changed his mind *during* the discovery deposition—is unsupported by any of the testimony he had given at the discovery deposition. It is true that Dr. Eckstein misremembered the plaintiff's case during the discovery deposition and initially had testified that the perforation of the colon was due to diverticulitis. But even *after* he began reviewing the medical records and realized no diverticulitis was found in the pathology report, he stated he could not determine the cause of the perforation within a reasonable degree of medical probability.

At no point during the discovery deposition did Dr. Eckstein indicate that he was changing his mind *after* he declined to opine as to the cause of the perforation within a reasonable degree of medical probability. The most he said during the plaintiff's cross-examination was that (1) the pain medication the plaintiff was taking from his spine surgery "could have" been the cause of the plaintiff's constipation, and (2) the perforation "could

have" been an injury from the enemas themselves, but this was difficult to assess with a hundred percent level of certainty. The plaintiff's counsel never elicited any testimony from Dr. Eckstein during the pretrial deposition that the self-administered enemas were a likely or probable cause of the perforation. In short, Dr. Eckstein never articulated during the discovery deposition that he was changing his mind. And Dr. Eckstein even admitted at trial that his opinion had "evolved" after the earlier deposition.

When judged against his pretrial deposition, Dr. Eckstein's new causation opinion was a surprise within the meaning of *Binger*. The new opinion was a substantial change in the doctor's level of certainty regarding the cause of the colon perforation. Once the trial commenced, the franchisee had a right to expect that discovery and examinations would cease.

The franchisee had little to no ability to cure the prejudice. While the franchisee certainly should have known from the plaintiff's medical records that linking the colon perforation to the restaurant slip-and-fall would be a trial issue, the franchisee did not know from those records whether the plaintiff might have sufficient evidence to prove such a link. And Dr. Eckstein's pretrial deposition gave the franchisee a reasonable belief that it might prevail on that aspect of damages by its motion in limine or argument to the jury. Had the franchisee known of the changed testimony in advance of trial, it could have adjusted its trial strategy by hiring a competing expert.

For these reasons, we conclude the trial court abused its discretion in admitting the surprise mid-trial expert opinion.

### The Appropriate Remedy is a New Trial on Damages

A new trial may be limited to damages where "the issues of liability and damages were not so interrelated as to require a new trial on both." *Steinbauer Assocs., Inc. v. Smith*, 599 So. 2d 746, 749 (Fla. 3d DCA 1992). Where the basis for this court's reversal is testimony affecting damages, we remand for a retrial on damages only. *J.B.*, 675 So. 2d at 244. Where the reason for the new trial relates only to the issue of damages, granting a new trial on all issues is error. *McIntosh v. Flagler Title Co.*, 483 So. 2d 50, 50 (Fla. 4th DCA 1986).

By contrast, a new trial "limited to a single issue is inappropriate when the new trial is necessitated by some error at trial which has prejudiced the jury broadly on all issues," or when "the issue is interrelated with

17

another issue or is not separable from another issue." *Cedars of Lebanon Hosp. Corp. v. Silva*, 476 So. 2d 696, 704 (Fla. 3d DCA 1985).

Here, liability and damages were not so intertwined as to require a new trial on both issues. The franchisee's liability turned on whether it had actual or constructive notice of a dangerous condition on the restroom floor. By contrast, Dr. Eckstein's changed opinion related only to the issue of damages—namely, whether the plaintiff's colon perforation was an injury or damage caused by the accident. The issues were separable. The jury is presumed to follow the trial court's instruction not to base its verdict on sympathy. There is no reason to believe the jury disregarded this instruction in its determination of liability. Unlike *Gomaco Corp. v. Faith*, 550 So. 2d 482, 483 (Fla. 2d DCA 1989), the case cited by the franchisee, this is not a case where the colon perforation evidence was so gruesome and inflammatory that it permeated the entire case to the prejudice of the defendant.

The parties disagree over whether the new opinion Dr. Eckstein offered at trial should be admitted at any retrial. Our case law takes two different approaches to this issue.

On the one hand, *Belmont v. North Broward Hospital District*, 727 So. 2d 992 (Fla. 4th DCA 1999), involved the erroneous admission of changed expert opinions at trial. In reversing for a new trial, we observed that "[o]ur reversal does not preclude the admission of the changed opinions of [the doctors] on retrial." *Id.* at 994. We wrote that "[i]f the defendants do seek to present this evidence on retrial, plaintiffs must be given an opportunity to fully examine any witnesses so testifying by deposition and to call additional experts on this issue." *Id.* The *Belmont* approach emphasizes the truth-seeking function of the trial.

On the other hand, in *Keller Industries v. Volk*, 657 So. 2d 1200, 1201–03 (Fla. 4th DCA 1995), we reversed a case for a new trial where the trial court erred in barring an expert witness from testifying altogether rather than merely prohibiting him from offering a new opinion. We held that the proponent of the undisclosed expert opinion would not be allowed to present the new opinion at the retrial:

> [T]he dictates of justice demand that we "freeze frame" these proceedings to the extent possible in order to prevent appellant from circumventing the decision of this court and obtaining a second bite of the apple. Accordingly, the pleadings are to remain unchanged and upon retrial appellant

18

> may not . . . elicit from [the expert] his affirmative opinion regarding causation.

*Id.* at 1203 (internal citation omitted). The value underlying the *Keller Industries* "freeze frame" approach is the deterrence of intentional or bad faith noncompliance with procedural rules or court orders.

We reconcile these two approaches by deferring to the trial court to make the initial determination of which retrial approach to utilize. If the trial court determines that there has been intentional or bad faith noncompliance with court rules or orders, then the *Keller Industries* approach may be appropriate. However, in the absence of bad faith or intentional misconduct, the trial court should apply *Belmont* on retrial.

Based on the foregoing, we reverse and remand for a new trial on damages only, including the issues of amount and causation.

*Reversed and remanded for a new trial consistent with this opinion.*

FORST and ARTAU, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

19